Pennsylvania Manufacturers' Association Insurance Company, Petitioner *v.* William J. Sheppard, Insurance Commissioner of Pennsylvania. Respondent.

Argued March 8, 1977, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Roland Morris,* for petitioner.

*John H. Isom,* Assistant Attorney General, with him *Guy J. DePasquale,* Assistant Attorney General, and *Robert P. Kane,* Attorney General, for respondent.

Opinion by Judge Rogers, May 19, 1977:

The Pennsylvania Manufacturers' Association Insurance Company (PMA) filed a Petition for Declaratory Judgment and Equitable Relief in this Court, naming the State Insurance Commissioner as respondent. It seeks that we declare an order of the Insurance Commissioner that PMA contribute the sum of $713,866.32 to the State's Workmen's Compensation Security Fund to be invalid; that we declare that PMA has by a payment of $497,422.05 into the Fund fully discharged its present obligation; and that the Insurance Commissioner be enjoined from any effort to collect more money from PMA. The Insurance Commissioner has filed an answer asserting the correctness of his action calling upon PMA to contribute $713,-866.32 to the Fund. Each party filed a motion for summary judgment pursuant to Pa. R. C. P. No. 1035. We agree with the parties that there is no genuine issue as to any material fact and will dispose of the case by overruling PMA's motion and granting that of the Insurance Commissioner.

The case is a one-time affair occasioned by amendments made to an Act known as the Workmen's Compensation Security Fund Act, Act of July 1, 1937, P.L. 2532, *as amended*, 77 P.S. §1051 et seq. The Act prior to the amendments which we will shortly describe had created two public Funds, the first, "The Stock Workmen's Compensation Security Fund,"[1] and the second, "The Mutual Carrier and Reciprocal Exchange Workmen's Compensation Security Fund."[2] The Act stated in the case of each Fund that it was established "for the purpose of assuring to persons entitled thereto the compensation provided by the Workmen's Compensation Law for employments insured"[3] in insolvent

---

[1] Section 3, 77 P.S. §1053.

[2] Section 6, 77 P.S. §1056.

[3] Sections 3 and 6, 77 P.S. §§1053, 1056.

stock companies and insolvent mutual carriers or reciprocal exchanges. The same purpose was expressed in the title of the Act as one "[t]o establish funds to provide security for the payment of benefits in the event of the insolvency of an insurance carrier authorized to write workmen's compensation insurance . . . and to provide for the administration thereof."[4] Section 5 of the Act, 77 P.S. §1055, before the amendment hereinafter described, provided:

> For the privilege of carrying on the business of workmen's compensation insurance in this Commonwealth, every stock company shall pay into the stock fund on the first day of September, one thousand nine hundred and thirty-eight, a sum equal to one per centum of its net written premiums as shown by the return hereinbefore prescribed for the period ending June thirtieth, one thousand nine hundred and thirty-eight, and thereafter each such stock company upon filing each annual return shall pay a sum equal to one per centum of its net written premiums for the period covered by such return. When the aggregate amount of all such payments into the stock fund, together with accumulated interest thereon, less all its expenditures and known liabilities, becomes equal to five per centum of the loss reserves of all stock companies for the payment of benefits under the Workmen's Compensation Law as of June thirtieth next preceding, no further contributions to said fund shall be required to be made: Provided, however, That whenever thereafter the amount of said fund shall be reduced below five per centum of such loss reserves as of said date, by reason of payments from and known liabilities of said stock fund or by reason

---

[4] Title of the Act at P.L. 2532.

of an increase of the loss reserves of all stock companies, then such contribution to said fund shall be resumed from such date as the commissioner shall prescribe, and shall continue until such fund, over and above its known liabilities, shall be equal to five per centum of such reserves.

Section 8 of the Act, 77 P.S. §1058, before amendment, was identical to Section 5 except that in the former the phrase ''mutual carrier and reciprocal exchange'' is substituted for the phrase ''stock company,'' and the phrase ''mutual fund'' is substituted for ''stock fund.''

Extensive amendments to the Act were made by the Act of October 18, 1975, P.L. 419. Section 5 was amended so as to read as follows:

For the privilege of carrying on the business of workmen's compensation insurance in this Commonwealth, every stock company, mutual carrier and reciprocal exchange shall pay into the fund on the first day of September, one thousand nine hundred and thirty-eight, a sum equal to one per centum of its net written premiums as shown by the return hereinbefore prescribed for the period ending June thirtieth, one thousand nine hundred and thirty-eight, and thereafter each such stock company, mutual carrier and reciprocal exchange upon filing each annual return shall pay a sum equal to one per centum of its net written premiums for the period covered by such return. When the aggregate amount of all such payments into the fund, together with accumulated interest thereon, less all its expenditures and know[n] liabilities, becomes equal to five per centum of the loss reserves of all stock companies, mutual carriers and reciprocal exchanges for the payment of

benefits under the Workmen's Compensation Law as of June thirtieth next preceding, no further contribution to said fund shall be required to be made: Provided, however, That whenever thereafter the amount of said fund shall be reduced below five per centum of such loss reserves as of said date, by reason of payments from and known liabilities of said fund or by reasons of an increase of the loss reserves of all stock companies, mutual carriers and reciprocal exchanges, then such contribution to said fund shall be resumed from such date as the commissioner shall prescribe, and shall continue until such fund, over and above its known liabilities, shall be equal to five per centum of such reserves.

Section 8 was repealed. As a result of these and other changes the former "Stock Fund" and "Mutual Fund" were combined into one fund. The 1975 amendments were declared effective immediately upon their adoption on October 18, 1975.

On or before September 1, 1975, before the amendments made by the Act of October 18, 1975, the insurance carriers subject to the Act had filed the annual returns for the period ending June 30, 1975 required by Section 5. On November 10, 1975, the Insurance Commissioner wrote to PMA, a stock company, as follows:

RE: ANNUAL RETURN TO THE STOCK WORKMEN'S COMPENSATION SECURITY FUND FOR THE PERIOD JULY 1, 1974, TO JUNE 30, 1975

All the returns in caption have been tabulated and the financial condition of the Stock Workmen's Compensation Security Fund for the year ending June 30, 1975, has been determined. The ratio of net worth to loss reserves as of

June 30, 1975, of the stock fund was 4.3614. Since this ratio is below the 5 percent minimum prescribed by Section 5 (77 P.S. 1055) of the Workmen's Compensation Security Fund Act of July 1, 1937, P.L. 3532, as amended by the Act of July 2, 1953, P.L. 347, it is therefore necessary to call upon the stock companies to resume contributions to the stock fund in accordance with the requirements of the Security Fund Act.

The amount of contribution which is required of the stock companies reporting to the stock fund is 1 percent of the net compensation premiums on policies written or renewed in Pennsylvania during the period from July 1, 1974, to June 30, 1975. According to the annual return in caption, filed under oath with this Department by your company, net compensation premiums on policies written or renewed in Pennsylvania are reported as $71,386,632. One percent of this amount or $713,866.32 is the amount of contribution which must now be paid by your company.

. . . .

Section 15 (77 P.S. 1065) of the Workmen's Compensation Security Fund Act of July 1, 1937, P.L. 2532 provides in part as follows: 'contributions to the funds created by this Act at the rates fixed by this Act shall be allowed in full as expenses of the business of Workmen's Compensation Insurance by the Commissioner in fixing and approving rates and such insurance.'

Accordingly, a 1 percent expense loading to reflect the 1 percent presumption in contributions previously referred to herein was included in

the latest revision in Pennsylvania Workmen's Compensation Insurance rates submitted by the Pennsylvania Compensation Rating Bureau and by the Coal Mine Compensation Rating Bureau of Pennsylvania.

On November 25, 1975, in response to questions of PMA, an actuary for the Insurance Department wrote to PMA as follows:

RE: ANNUAL RETURN TO THE WORKMEN'S COMPENSATION SECURITY FUNDS

Dear Mr. Webster:

As of June 30, 1975, the total net worth of the Stock Workmen's Compensation Security Fund was $11,483,698.96 with the total loss reserves of all stock companies being $263,302,765. Five percent of the loss reserves amounts to $13,-165,138.25. When you substract the five percent of loss reserves from the net worth of the Fund, you come up with a deficiency of $1,681,-439.29. The total net premiums written by all stock companies for the period July 1, 1974 to June 30, 1975 were $241,310,956. The total amount we would receive based on a one percent assessment would be $2,413,109.56.

As of the same date, the Mutual Fund had a net worth of $4,655,947.29 with total loss reserves of $119,086,364. Five percent of the loss reserves amounts to $5,954,318.20. When you subtract the five percent of loss reserves from the net worth of the Fund, you come up with a deficiency of $1,298,370.91. The total net premiums written by all companies that contribute to the Mutual Fund were $878,704.31. The total amount we would receive based on a one percent assessment would be $878,704.31.

Since there is no longer two separate Funds, the consideration given as to the amount of the assessment necessary to comply with the law was based on the consideration of the two Funds.

The exhibit shown below will give you a recap of what was explained above.

| | |
|---|---|
| Total surplus of the two Funds combined | $16,139,646.25 |
| Five percent of the total reserves | 19,119,456.45 |
| Deficiency | $ 2,979,810.20 |
| One percent assessment | 3,291,813.87 |
| Excess | $ 312,003.67 |

With the tremendous increase in the reserves due to the increase in benefits, we feel that the excess as shown previously is a reasonable cushion to assure we continue to be in compliance with the law. This in no way guarantees that there will not be an additional assessment next year.

You must not lose sight of the fact that in anticipation of this assessment, we permitted you to put a one percent loading in your latest rate filing and also increase your tax multiplier by one percent for all retrospectively rated risks.

In support of its motion for summary judgment, PMA first makes calculations based on the information in the Insurance Department's letter to it of November 25, 1975. PMA says that since, based on the annual returns for the year ended June 30, 1975, the Stock Security Fund had a deficiency as of that date in the amount of $1,681,439.29; the total net

premiums written by stock companies between July 1, 1974 and June 30, 1975 was $241,310,956; and $241,-310,956 is .6968% of $1,681,439.29, the stock companies should have been asked to contribute only a sum equal to .6968% of their net written premiums, not 1% as required by the Insurance Commissioner. Therefore, PMA says it should have been asked by the Insurance Commissioner to contribute only $497,422.05, this being .6968% of its net written premiums of $71,386,632. Since it has paid this amount it therefore owes nothing. PMA continues its calculations by noting that the deficiency in the Mutual Carrier and Reciprocal Exchange Workmen's Compensation Security Fund as of June 30, 1975 was $1,298,370.91; that the total net premiums written by companies contributing to the Mutual Fund was $87,870,431; that $1,298,370.91 is 1.4776% of $87,870,431; and in order to bring the Mutual Fund up to the level of 5% of loss reserves, it would have been necessary to collect from all of the Mutual Carriers 1.4776% of their net written premiums. Since Section 5 limits the amount which can be collected from carriers in any year to 1% of net written premiums there would, PMA agrees, remain a deficiency in the Mutual Fund of about $419,500. This, PMA says, would be made up in the following year, by collecting from the Mutual Carriers in addition to any other sums needed to cure a deficiency, the remaining .4776% of their net written premiums. PMA says that the Insurance Commissioner should have done all of the foregoing. We are constrained to point out here first, that this course of action would have the Insurance Commissioner administering the Act as though there were two separate Funds in late 1976; more than a year after the separate Funds had been abolished by statute; and second, and more importantly, that another result of PMA's scheme would be that the amount available to pay claims, required

by the statute to be 5% of loss reserves of all companies, would be about $419,500 less than the statutory minimum from November 1965 until, at the earliest, late September 1976.

PMA argues, nevertheless, that the law requires these results. It says first, that Section 5 properly construed establishes the amount of 5% of loss reserves as the absolute maximum which may be in the Fund, and forbids the Insurance Commissioner from seeking to collect from carriers any amount which would cause the Fund to exceed a sum equal to more than 5% of loss reserves. So imperative is Section 5's limitation on the amount of the Funds, says PMA, that the Insurance Commissioner must carry the fraction of 1% of net losses to four places so as not to produce a Fund containing more than the Act allows. PMA's interpretation is, in our opinion, exactly contrary to what we believe the Legislature intended. As its title and Section 3 of the Act declare, the Legislature's purpose was to create a Fund for the payment of benefits to injured workers whose employers had placed insurance in insolvent carriers. The emphasis of Section 5 is not on preventing the Fund from exceeding 5% of loss reserves, but in establishing and in maintaining it in at least that amount by contributions of all carriers. The section says that the Fund shall equal 5% of loss reserves, not that it must never exceed that amount. Indeed, the only precise limitation is that contributions to a deficient Fund may not be required to exceed 1% of net written premiums in any year. There is nothing in Section 5 suggesting that the Insurance Commissioner in calling for contributions in the face of a deficit has any limitation on his power other than that he may not ask for more than 1% of net written premiums. PMA's interpretation of Section 5 to mean that the Insurance Commissioner, upon examining returns and finding the defi-

ciency in the Fund as of June 30, must collect no fraction of 1% of loss reserves larger than that which will exactly restore the deficiency is misconceived. It would, for instance, forbid the Insurance Commissioner from collecting in September more than the amount needed to cure a deficiency which existed as of June 30 next preceding even in the face of sure knowledge that a serious additional depletion of the Fund had occurred after June 30. We believe that Section 5 gives the Insurance Commissioner discretion in the face of a deficiency in the Fund to collect such percentage of net written premiums, not exceeding 1%, as he reasonably believes the health of the Fund requires.

PMA's second argument, which is entangled with the first, is that the Insurance Commissioner's action taken during November 1976 of calling upon the stock companies to contribute 1% of net written premiums instead of the .6968% which would have been all that would have been needed to bring the stock companies Fund up to 5% of their loss reserves, gave a retroactive effect to the amendment of October 18, 1975, contrary to the Statutory Construction Act, 1 Pa. C.S. §1926. The contention, as we understand it, is that because the return required to be filed by September 1, 1975, reported with respect to conditions as of the year ending June 30, 1975, the latter date was the time as of which the Insurance Commissioner's call for contributions should be considered to have been made; that on June 30, 1975 there were two Funds; that the Stock Company Fund's deficiency required a contribution of only .6968% of net written premiums; and that the Insurance Commissioner's call for contributions from stock companies in the amount of 1% of net written premiums gave retroactive effect to the amendments of October 18, 1975 abolishing the two

Funds and creating one.[5]   To the contrary, we believe that if the Insurance Commissioner had in November 1975 done what PMA says he should have done—that is, acted as though there were still two Funds and two classes of contributors—he would have been acting in pursuance of repealed legislation. PMA has again misinterpreted Section 5.   The June 30 and September 1 dates are only parts of a mechanism provided for testing whether the amount in Fund is at least equal to the minimum required by statute.   If, after the Insurance Commissioner gets the forms on September 1 and has made the necessary calculations, it appears that there is a deficiency, he must call for a resumption of contribution "from such date as the Commissioner shall prescribe."   The process is not completed until the Insurance Commissioner prescribes the resumption of contributions.   That occurred in November 1975, at which time there was one Fund and one class of contributors consisting of stock companies, mutual carriers and reciprocal exchanges.

PMA also complains that the Insurance Commissioner's action denied it due process and equal protection of the law.   The arguments are really founded on the assumption of the correctness of PMA's interpretation of Section 5, which we have rejected.   They nevertheless compel us to emphasize that Section 15 of the Act, 77 P.S. §1065, provides that contributions to the Fund must be allowed in full as expenses of the business of Workmen's Compensation Insurance by the Commissioner in fixing and approving rates for such insurance.   We gather that PMA's answer to the

---

[5] We should say here that PMA does not complain that the Insurance Commissioner deliberately or otherwise improperly delayed in issuing his collection notice.   Indeed, PMA has supplied by affidavit in support of an argument that it is proper for the Commissioner to collect less than 1% of net written premiums, a collection letter of a former Insurance Commissioner sent in March of 1974 with respect to the year ending June 30, 1973.

Insurance Commissioner's assertion that PMA wishes to collect additional premiums in the amount of $713,-866.32 on account of a contribution of only $497,422.05, is that the Insurance Commissioner has not approved its request for a rate increase of 35.4%, but reduced the request to an increase of 21.3%. If the Insurance Department has not included the contribution here complained of as an expense in acting on PMA's rate requests, it has violated the law and PMA has, and will no doubt be astute to seek, redress in other proceedings.

We therefore enter the following final

ORDER

AND Now, this 19th day of May, 1977, it is ordered and decreed that the Pennsylvania Manufacturers' Association Insurance Company's motion for summary judgment be and it is hereby denied; that the Insurance Commissioner's motion for summary judgment be and it is hereby granted; and that judgment be and it hereby is entered in favor of the respondent Insurance Commissioner and against the petitioner the Pennsylvania Manufacturers' Association Insurance Company, in the amount of $216,464.27 together with lawful penalties to the date of payment.